May it please the Court, Josh Rosenkranz on behalf of MGA. Your Honors, the District Court in this case imposed a draconian remedy that threatens the imminent demise of a highly successful worldwide enterprise. Too big to fail. Well, Your Honor, it's on the brink of failure and all because of a series of draconian orders that the District Court imposed. A worldwide copyright injunction, a worldwide and unprecedented constructive trust that it was infected with multiple legal errors. This case presents errors that go to the heart of copyright law and tort law and the scope, the permissible scope of equitable remedies. But the appeal logically begins with an ambiguous, barely legible contract preprinted as an employment agreement that has been aggressively interpreted against the employee in this case in a manner that threatens basic economic freedoms. You're talking about the inventions agreement? Yes, Your Honor. This two-page... The most important document in the entire case. Yes, but a document... You can't read it without a magnifying glass. Your Honor, neither can I. This is the best copy in the record. But we know it doesn't have the word ideas in it. We know it does not have the word ideas in it. And this single piece of paper became the engine of economic ruin for MGA. So let's talk, Your Honor, about the two ambiguities, one of which goes to the idea for the name brass, the ideas piece, the other of which goes to all of the equitable relief that was granted. Now, to Judge Wardwell's point, the very notion of an employer laying claim to an employee's ideas is very scary. It means that any time someone succeeds in a business, his past employer can seven years later come up and say, I know you had that idea when you worked with me. If an employer wants to lay claim to ideas, if that's even legal, Your Honors, it has to at least be clearly laid out in the document, especially when we're talking about a contract of adhesion, which this was. At a bare minimum, Judge Wardwell, yes, it's got to say the word ideas, the agreement here. Okay, well, how do you interpret the word when it talks about ownership of inventions? I agree to communicate to the company as promptly and fully as possible all inventions, as defined below, conceived or produced. Sure you are. Does the word conceive imply ideas? No, Your Honor. The word, first of all, the question is whether it's a clear message to the employee, not whether there's an implication. But conceived, conceived what? Conceived inventions, that is something more concrete than an inchoate idea. And I hasten to add the preamble, which I know is illegible as well, tells the employee that this contract covers inventions that the employee creates, which is, of course, what any employee in a creative environment would think. No employee who's creative would think that my employer owns every one of my ideas, even if it's an idea about the toy business. When Mr. Bryant, when he created, when he drew the dolls, is that creating an invention? Absolutely not, Your Honor. Oh, excuse me, the drawings themselves. Right. We're not arguing on this appeal that the drawings themselves were not covered, although we had a big argument about that below. That's an intangible form of expression at that point. It's not a pure idea. Yes, and also because, Your Honor, the contract refers to designs. So we're not disputing for present purposes. And there are, again, two completely different sets of relief that were granted here. There's the relief, the constructive trust over the idea for the name Bratz, and that's what we're talking about now. And then there's the copyright injunction, which goes to the designs. The constructive trust is over trademarks. The constructive trust, yes, Your Honor, is over trademarks, and then there's an injunction as well against the use of a trademark. Okay, so let's go back to ideas. How does 2870 that's referred to here, which I can barely read, limit this document and allow the employee to come up with ideas on his or her own time, et cetera, et cetera? Is that of any moment, that limitation? Your Honor, huge ambiguity there. 2870, that provision there, of course, is incorporated into the contract by virtue of law, by operation of law, it had to be there. Now, Mattel was very careful. Mattel said in writing that provision that it applies only to inventions that qualify under 2870. Well, 2870 has always been about technical and scientific innovations. It was all about the assignment of patent rights. It wasn't about designs that are created by creative people, visual arts, and it certainly was never about ideas. No court has ever interpreted 2870 to cover just ideas or creative works more broadly. And then just one final point on the ideas issue. There are strong reasons not to read ideas into this contract. First, as I said already, the contract refers to what the employee created. Secondly, Mattel actually had versions of this agreement that are in this record that incorporated the word ideas. This time is limited, and this is in the briefs. Maybe you could tell us, let's say we give you the point about ideas, just so we get past it. What flows from all that? The point about ideas, Your Honor? Yeah. If you're right. We're right about ideas. You're right, because we understand your argument, I think, and just move forward. Yes. So if we're right about ideas, Your Honor, the entire constructive trust falls, because the constructive trust has at its heart the taking of a piece of property that is erased, that is owned by Mattel. If Mattel didn't own the idea, the constructive trust over the trademark that used that idea is gone. But there is another contract point I hasten to add. I'm sorry. Can you remind me one more time? Yes, Your Honor. The trademarks are the name Bratz. The name Bratz used on 14,000 products that Carter Bryant never thought of, but it's just the business, Bratz, and the use of that name in connection with anything. But Carter Bryant brought the name Bratz to MGA, right? He did indeed, yes, Your Honor. And by the way, Mattel moved the name Bratz as well and rejected the notion of creating a business around the name Bratz. That's of no moment, Your Honor. No, whatsoever. You're free to discard stuff, Your Honor. Absolutely, Your Honor. Yes. But the disconnect I'm having, you know, it's one thing to have an idea. It's another thing to have an actual name and designs and things of that sort. So let's say an idea goes out the window, but you still got a name. You've got designs. Wasn't there a mock-up of it? Yes, Your Honor. So, again, let me separate out. If you get to the facts, you're getting way beyond just ideas in terms of what he took to MGA. I agree as to the designs, but the idea for the name Bratz, which is the only basis, that is the name, just the name, the only basis on which Mattel has a constructive trust, because it was the name Bratz, it argues, that matured into the trademark, perhaps. That's asserting ownership over the idea, and that's the only theory that Mattel asserted. Then there's a completely separate conversation about the creative products. It's sort of a fine point. What's the difference between the idea of a name and the name itself? If you write it down on a piece of paper? No, Your Honor. If you write it down on a piece of paper and it becomes part of a creative work, copyright law would then control the fair use of that word. But Mattel is laying ownership. No, something can be both a trademark and a copyright. So, I don't, it might, you might also get copyright protections, but. The only source of Mattel's claim for the trade name is that Carter Bryant thought of the name while he was at Mattel. That's the only basis of the assertion of a claim to the ultimate trademark. But let me then, let me. Could you just maybe walk me through this one a little bit? Because the constructive trust ruling, Judge Larson went through the requirements for the constructive trust and boiled them down to the rest, and the right of the complaining party to that rest, and some wrongful acquisition or detention of the rest. And then he says the jury found that the NGA parties wrongfully acquired the idea for the name rest. So, what is he saying is the rest here, the idea for the name rest? Yes, Your Honor. That's what he says is the rest. And then he says that that rest had an accretion of value. So, the next element is the right of the complaining party to the rest. So, your point is that if Judge Larson based the constructive trust on the rest of the idea, Mattel, who's the complaining party, did not have the right to that. That's correct, Your Honor. Not the right to the idea, and certainly not the right to the fruits of NGA's labors and the hundreds of millions of dollars. I'm jumping ahead. And then the wrongful acquisition. Which the jury did not find, Your Honor. The jury only found that the idea was conceived while at Mattel. Judge Larson directed a verdict on the notion that anything that was conceived then was owned. So, what satisfied this third element of the constructive trust? The third element being which one, Your Honor? The wrongful acquisition. Nothing, Your Honor. It was not wrongfully acquired because, in our view, Mattel didn't own it. And then Mattel doesn't even if it owns – But that was Judge Larson's theory for that. Oh, I don't know what his theory was, Your Honor, except that – well, his theory goes back to the contract. But I did have one other observation to make about the contract, because there's a second argument, a second ambiguity, which flows from the word during my employment. So, Mattel says, or the employee when he signs says, Mattel owns all my creative works made, and according to Mattel, all the ideas I came up with during my employment. So, the ambiguity is, does that mean temporarily from the time I was hired to the time I left, or does it mean in the course of my employment, which any creative person would believe is what it means. When you assign me work, you own my ideas. It's what copyright law would say, and it's what the law of agency would say under the restatement. The latter is the much stronger reading, but, of course, we don't have to prevail on which reading is stronger. All we have to do is demonstrate that there's an ambiguity, because, again, on both arguments, this is a contract of adhesion which has to be construed strictly against Mattel. Let me turn, though, to the other piece of this case, which is the copyright piece. And not to miss words, I just want to make sure the court understands that this is what the district court enjoins. Any doll that has either this head or this body, it doesn't matter what paint Mattel, excuse me, MGA painted on it. It doesn't matter what the features are. I don't know that the court has had this exhibit, but I'm happy to hand it up to the court if it wishes. That's just plain wrong as a matter of copyright law. Mattel does not own this uniform. Mattel does not own anything that can be done to this mini-mannequin. The district court reached the wrong conclusion because it applied the wrong copyright analysis. So, first, the district court asked whether the dolls were substantially similar when it should have asked, to the drunk, that is, when it should have asked whether they were virtually identical. Every time this court has ever confronted a case involving a visual image of a human being or an animal, this court has concluded that only film protection applies. Secondly, the district court was supposed to begin by breaking down the overall creative work into its constituent elements, the eyes, the lips, the oversized head, and ask whether each of them was independently protected. He absolutely did not, Your Honor. What was protectable and what wasn't? No, Your Honor. What he did, if you look at the column that says not protected, what he did was to say, basically, the human form is not protected. That is, anything that has eyes, ears, a mouth, a big head is not protected. But he never, ever broke it down into each individual element. He never said, well, let's look at these eyes. They're almond-shaped eyes. Well, does Mattel own almond-shaped eyes? No, that's not protected. And, in fact, the district court did the absolute opposite of that. What it said is that it believed that a, quote, combination of otherwise, quote, non-protectable elements gets full copyright protection. Well, that's the opposite of this court's teaching, which is that a combination of unprotected elements gets only film protection. Thirdly, the district court held that the only thing that was not protectable, as I was just saying, was that right-hand column, the human form itself. And, finally, the district court thought that in conducting the objective prong of the analysis, it was permissible to ask whether the compilation expresses a unique style, whether the clues express an aggressive, contemporary, youthful style, or whether it conveys a distinct look. Now, that's the second half of the analysis. That's the subjective analysis. Finally, I'd like to, unless there are more questions on copyright, I'd like to turn then to the state law claims that, along with ownership, form the basis of the constructive trust. Now, I'll rest on the briefs with respect to fiduciary duty, that is, whether a contract that uses three words, that position of trust, could possibly communicate to an employee clearly, a rank-and-file employee, that he has now assumed the ultimate fiduciary duty as a fiduciary to the company. It didn't say fiduciary duty. It never said fiduciary duty. Using that word would convey to the ordinary employer what it meant. It absolutely Lawyers? No, Your Honor. The only way to, if you Position of trust is a little clearer. Well, position of trust simply means that in conjunction with the first half of that sentence, which is, I understand that I must be trusted to keep confidential information, I accept that position of trust. That means you can trust me to keep the confidential information confidential. But when I say that it didn't convey that he was a fiduciary, I'm not just saying it didn't use the words fiduciary. If you want to impose, an employer wants to impose on a rank-and-file, $60,000 a year employee, fiduciary obligations in a contract of adhesion, it has to convey clearly what it means by that. There's enormous, massive tort liability that can flow from a simple breach of contract, and this contract didn't do that. But I was saying, I was not going to belabor What flows from that? Let's say we give you that point. What flows from that? The entire constructive trust falls, Your Honor, because although the constructive trust was based on three theories of liability, and I'm going to get to this in a moment, the other two prongs are those prongs that had nothing to do with the sharing of confidential information. As the jury was instructed, those prongs had to do with nothing but the signing of an agreement to go and take a position as a consultant with a competitor. And so that's the error that I was going to focus on, because it topples all three of the state law claims all at once. So what is the it?  That is a breach of the duty of loyalty simply to sign a contract to compete with his current employer in the future. That's what the district court told the jury is as a matter of law a violation of the duty of loyalty. And if that, I mean, that's clearly not true. Before we get to that, let's get back to my question. Let's say we look at the contract and we wind up agreeing with you that there is no fiduciary duty created by means of the contract. Let's just accept that fact. And your answer was, I said, what happens then? And your answer was that knocks out the constructive trust. Yes, Your Honor. And then you went on to talk about the other two theories. But I'm not quite there yet. I'm with you. Let's put the other two theories aside. Let me explain. Okay. And why does, do you need fiduciary duty to set up a constructive trust? You do not, Your Honor. My point is. So if you knock it out, you still can have a constructive trust. Absolutely. In theory. Until Judge Kaczynski finishes. I'm sorry, Your Honor. Absolutely. I apologize. I don't understand your answer. I apologize. Yes. And so the answer is this. When the fiduciary duty is struck, there then remain only two other theories. So, yes, that is duty of loyalty and tortious interference with contract. Okay. In theory, those two claims could support a constructive trust. They can't in this case. Because the constructive trust is based on the premise that MGA improperly acquired something that belonged to Mattel. The duty of loyalty theory and the tortious interference theory, as the jury was directed, had nothing to do with the sharing of confidential information. So there's no basis to conclude that the sharing of confidential information was tortious. The only theories that the jury found were that the signing of the contract was a violation of the duty of loyalty, and that it was tortious interference with the contract of an employee at will to induce him or encourage him to sign such a contract. I'm sorry. Let me go back again. You can't have a constructive trust on the California law for a near breach of contract? I think one can have a constructive trust for a near breach of contract. Without the creation of fiduciary duty, without tortious interference, without having a tort. You keep getting back to this idea that there was no tort. But let's take the torts out of the picture for the time being. Let's just focus on the contract itself. You say there is no fiduciary duty created, and we'll give you that point for the purpose of this discussion. There's still a breach of contract. Your Honor, Mattel never proceeded on a breach of contract theory. The only claims supporting Mattel's constructive trust are the three tort theories. And the reason that there's no breach of contract theory is that this was not a trade secret, and the only thing that Carter Bryant was prohibited under the contract from sharing were trade secrets, quote-unquote, proprietary information. Your Honor, as we see, we're into the time that I wanted to reserve for rebuttal. So unless there are further questions, I'd like to watch over the time. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Daniel Collins, member of Tarleton Olson, on behalf of Mattel. With respect to the issue of ideas, in response to one of the questions that the Court asked, I think that even if you were to assume that ideas were not covered by the agreement in the abstract, that nothing follows from that for purposes of the constructive trust. And that's for two reasons. First, the use of the term design already captures it when, as the jury specifically found here, and I'm referring to a drawing that's at ER 6105, that Mattel owned designs of dolls, which are sketchy dolls, on top of the word Bratz. Okay, that's the copyright claim, right? That's property in the form of copyright ownership. There is a copyright in that document, but what it also shows is that, factually, they didn't come up with the name Bratz on their own. Factually, they got the name from Carter Bryant in the same course of misconduct that produced, you know, the theft of these. Well, you know, this is one of the problems I had with all of the briefs and the oversized briefs. Nothing is very, really logical because when you're trying to say, okay, what was covered or not covered by this agreement, what actually existed and what of that could possibly form the rest for purposes of a constructive trust? Because ultimately what we're here about is the two remedies, principally the constructive trust of the worldwide trademarks, right? That's correct. So what's the logical flow between all of these things? The copyright. The fact that Mattel had a copyright in the works that were reduced to a tangible form of expression while Bryant was there does not, will not satisfy the requirements for a constructive trust. So what does? What satisfies it is that the acquisition factually and even apart from the issue of ideas, although I'll get to that in a moment, was wrongfully acquired by MGA and the food of that wrongful conduct. Wrongfully acquired by MGA. The name Bratz associated. How was it wrongfully acquired? It was wrongfully acquired in two respects. One is that it's part and parcel of these designs. This isn't a name. What did MGA do that was wrongful when it entered into a design contract with Bryant? It did, it committed the three torts that were found here. It aided and abetted a breach of fiduciary duty, a duty of loyalty and torture. We have to find that there was a fiduciary duty beyond keeping the protective proprietary information confidential, and we have to find that there was a duty of loyalty. You only need to find one of them. There was no contract other than the conventions and the confidentiality contract. Bryant was an at-will employee. So I don't know how you could intentionally interfere with that. They intentionally interfered with the inventions agreement. That's the contract with which they interfered. That's correct. And they interfered with that because he was supposed to assign to Mattel the drawings that were created during the time that he was a Mattel employee, and then also the idea for the name Brass that went with that entire design of dolls. And instead, through the misconduct that was found by the district court, which was fraudulently concealed also as found by the jury and by the district court, they instead acquired the rights to the dolls and then ripened the name that was with those created by Carter Bryant during that as part of the same parcel of conduct into a trademark. It's the fruit of one... They didn't really do that. Brass was already a trademark owned by someone else. What they did was they purchased the rights to that trademark from that other person and said, oh, that's wrongful. That's not correct, Your Honor. They got the name factually from Carter Bryant. They then got into litigation with someone else who claimed it. They went to register it and found out that it belonged to someone else. And then they settled that dispute. They got the idea of the name, right? We're still back to the idea? They got the idea for the name Brass from Carter Bryant. They settled with the other party. They never conceded that they acquired the rights from them. Indeed, they've always taken the position that their rights existed and predated and stood apart from that acquisition in connection with the settlement of that litigation. But the ideas are covered because even without the word idea being in there, they're part of a design. They're part of an invention. You can use in common parlance, as we indicated in the papers, inventing a name. It makes particular sense when you're talking about a product line, inventing a product line. The idea of referring to that as inventing the name is not at all unusual. The use of the term conceived in the contract also reinforces that. You have to also understand the presentation of this issue when Bryant claimed on summary judgment that it did not reach the drawings because the name was not really the issue, the core issue in the interpretation of summary judgment. The argument is that it was limited to technological matters. That's an argument they've hinted at when they referred to the labor code provision as having a similar restriction, which it does not. The case law, the ICONICS case we've cited, also indicates that it goes well beyond technological matters and can extend to other property. So that covers the idea. They also raise a second argument with respect to what is the meaning of at any time during my employment by the company. And with respect to that, they really ignore the phrase at any time, a phrase that doesn't make any sense if you read the phrase during my employment at the company to mean only between nine and five. At any time underscores that it's at any time during the employment. The labor code reference. I think it I think it tilts in that direction. If there's any residual ambiguity, I think it's resolved by the labor code reference and the entire recitation of that. You've got the other part that deals with employers business under the labor code, but at any time could just mean at any time I'm at work, right? While you're asleep or while you're vacationing or Bermuda or whatever. I think that at any at any time during my employment, as opposed to saying during my employment, I think it tilts in the direction of saying at any time. But I also think the labor code reference. When you go to the bathroom, when you take a take lunch, you know, if you have work. I don't think it buys you much of anything. I think the labor code reference, though, is dispositive because the labor code reference expressly discusses the concept of inventions developed, quote, entirely on his or her own time. That's exactly what it refers to. But it says that they're only excluded if certain conditions are met. If you read the rule. That is more helpful to you, and I thought that's where you were focused. But, you know, it's so curious that your client's contract, which is not written in the most legible or visible way or intuitive way, but that's here, here, and there, I suppose, but does not say, does it say when you're at home, when you're sleeping, when you're showering? It doesn't make any. Does it make allusion to maybe I missed it? Because let me find again. I got it. It's not. I put a copy that's in the record. You can tell it has been reduced as it's been copied into an exhibit. I can't tell that. I mean. OK. I put a clear copy of S.E.R. six fifty two. That's it's still the print is clear copy. Six fifty two S.E.R. six fifty two. Yes. This is the one I can't read without a magnifier. I apologize. That's the size of the print in the copy in the record. But Mr. Bryant, the evidence was clear that he sort of distracted by this and I probably shouldn't be. But I can't you can't believe you put this in front of somebody and say sign it again. I have magnifying glasses on and I have a hell of a hard time reading this thing. You can tell from the amount of night space around it, it has been reduced from the original. But the evidence also was clear that the original is the original. Not the. This is S.E.R. six fifty two. Is this the size of the original? It looked to me I could be wrong in my assumption. It looked to me like it had been reduced. But this is S.E.R. six fifty. Is this the original? That may be a different. That appears to be, Your Honor, a different document. It's six fifty two. That is that that's the copy we have in the record. But Mr. Bryant, the evidence was clear that he understood his obligations. His mother's deposition testimony, which was also read at trial. He indicated when he was referring to an earlier contract that he had with Mattel, that he understood that creating and then selling drawings to another company would interfere with his contract. And he also said at the trial that he did not have the understanding that his contract would allow him to give, come up with ideas and give them directly to a competitor while he was employed by Mattel. This language, I tend to agree that the incorporation of this labor code language more supports your argument. And it has a limitation to it. It says relate at the time of conception or reduction to practice of invention to the employer's business. So you think when you read that, do you read that to mean the employer's business of making Barbies or the employer's business of making any doll or the employer's business of making toys? I mean, what does that language mean? The statutory language means the line of business that the company is in. So Mr. Bryant worked in the sort of high fashion collectible Barbie area? He was a doll designer. When he was hired back in 1999, what was he hired to do? He was hired to be a doll designer. What area did he work in? He worked in Barbie collectibles. Right. That Barbie line of business? Yes, but I don't. He wasn't working in other doll lines. Are there other doll lines of business at Mattel? There are other doll lines. But I don't think there's any authority that indicates the statute applies only to the specific, you know, branded line. It would have almost no application if the exception were read that narrowly. The idea is to capture that, you know, if you work for a computer company and you, you know, make furniture, that that isn't necessarily captured by this. That's what it is, and there's an additional clause that says if you're going to. Can we get back to the language of the contract, which I have difficulty reading, so maybe you can just point out to me the language you rely on to cover his work that he did when he wasn't at work, when he wasn't at the office, so the stuff that he did on his own time or at home or on vacation or the like. What specific language of the contract do you rely on? The language that we rely on are primarily the two clauses to which I've referred. I'm asking for actual words. At any time during my employment by the company, and then in paragraph 2C, the language of the labor code, indicating that the assignment does not apply to an invention that the employee developed entirely on his or her own time without using the employment's equipment, supplies, facilities, except for those inventions that relate at the time of conception and reduction practice in the employer's business. That exception would never apply. I'm sorry. That language that you just said is specifically those words are in the contract? Yes, they are. They're in paragraph 2C. I'm trying to read paragraph 2C, and I see a reference to section 2870, but is there language like you just said that relates to the business? Yes. They have a quote in the second sentence of 2C from the language of the statute. I see a one and I see a two. Yes. It's before the one. The clause marked one says relate at the time of conception and reduction practice of the invention to the employer's business. But all of that is within quotes, and it's a quote from the actual text of 2870. I see. That's an actual quote. Right. And it's an untenable reading of the rule when the reading of the rule would render the exception never applicable. And where the exception talks specifically in terms of the limited conditions in which when you create something on your own time, it will not be covered. To then say that anything created on your own time is never covered by the agreement is just inconsistent with the text of that provision. It just makes no sense on the face of the language of the contract to read it that way. So it can't reasonably bear that reading. Don't you then get back at some point to the idea problem? There's nothing in here that says idea. There's nothing in there that says- Is that of any moment? I don't think it's of any moment because I do think that here it's reached by both the general concept of inventions, the name for a dollar line when you're talking about a case involving the drawings for dissolved designs. And when- I mean, I think that would be true even if they were just- you had those two facts. He came up with the name and that he developed the name. So if he just walked over and said to MGM, said, I've got an idea, that's covered? I think that would present a different case. I think you'd need to know exactly what the idea was. But I think where the idea is, the name for a product line that is developed in designs that he has, and the name is actually on the designs itself. I think it's very difficult to argue that the name is not part of the design in those circumstances. And even if it were not part of the design in those circumstances, the fact that it is still the fruit of the wrongful conduct, that it was acquired in the same course of wrongful conduct by which the drawings themselves were designed, and then exploited this entire line of property that he came up with and that was- What was the wrongful conduct again? Again, the wrongful conduct- How do you separate out Bryant from MGA? Because MGA's got the constructive trust. Bryant's got a nice settlement. So- There are two- there's two aspects to the wrongful conduct. There's the acquisition of the drawings, and then there's the acquisition of the name. Because we have argued that the name, despite the fact that the word idea does not occur within the contract, that the name is still covered by the general meaning of the term invention, particularly as applied in the- Why was the acquisition of the drawings wrongful? The acquisition of the drawings was wrongful because the drawings were created while he was employed by Mattel. They were therefore inventions because they do not contest that the drawings are inventions. Their only argument on that is this, you know, at the time of doing the term of employment, which I think the Labor Code section is dispositive of. Can we just focus on one question? Because we keep going back and back and back. Answer Jay's question. I think that I just did answer the question wrongful in the sense that it violated the agreement. Exactly. The agreement assigned these rights to Mattel in the drawings, and instead he assigned them to MGA. They were complicit in- Okay, so who did the wrongful conduct here? Well, in this case, because the verdict was returned against MGA, it's MGA- I understand the verdict. I understand what ensued. There were certain jury instructions that were given that almost ensured that that would be what ensued. So what I'm trying to figure out from you is you say they were wrongfully acquired. Wrongfully acquired by MGA? That's correct. Okay. What did MGA do wrong? MGA interfered- Did it have any idea that Bryant had this idea and it was covered by this invention agreement when it made its sale with Bryant? Yes. The district court made findings that-and the jury found that the misconduct had been fraudulently concealed by MGA. The district court made findings that they knew they had to find intentional in the jury instructions. They had to find that the conduct was intentional in order to find the tortious- But wasn't that the interference with contract conduct? No. I believe that the instructions have an intention element with respect to all of the torts that are at issue here. And there was not a directed verdict on any of those. For example, on the breach of contract, there's nearly a statement that as to what Bryant did, and it leaves the element of MGA's conduct and whether it crossed the line open for the jury. With respect to the breach of duty of loyalty, there was an instruction that Bryant had breached his duty of loyalty, but the question of whether or not the aiding and abetting by MGA, that breach of the duty of loyalty had been done, was left for the jury and was found by the jury. And there's ample evidence in this record of MGA's misconduct, their concealment, both in terms of their payments that were made to Bryant and to others before he left MGA, and then the concealment that occurred afterwards in terms of, let's keep him under wraps, don't ask in terms of what his dates of employment were. There's an ample record factually to support the finding that MGA intentionally caused the aiding and abetting of the breach of fiduciary duty and loyalty. What's Exhibit 11? Where did this come from? That's the same document, I believe, that I refer to as being at 6105. It's a better copy at 6105. It's in color and it's larger. Yeah, and you still can't read it underneath. Anyway, so who created that drawing? That's Carter Bryant. The jury found that they owned that. And what did he do with it? That he gave that to MGA. And was this on the back of it or a second copy, Meet the Brats? I don't know the particular document that you're referring to. I recognize the other one as being 6105. It says Meet the Brats, and then it talks about the four girls, Zoe, Lupe, Halliday, and Jade.  Attorney's eyes only. That's Bryant's writing, I assume. I believe that that's correct. But it's further factual support for the jury's specific finding, which they said in a particular question, that he came up with this idea during the time that he was at Mattel. Which is the document that he supposedly falsified the date on? There was a notary. He had notarized certain of the drawings in August of 1999. At a later point after that, the notary book was changed and someone put in from 1998 afterwards. That was shown for forensic analysis that that had been added. Again, it's further factual support that this was a whole story of it being created in 1998 was a fraudulent story that was made up afterwards. You were referring to inferences or things that the jury found. There was a special verdict for them? That's correct, Your Honor. And so what do we make of the $100 million damages award? They didn't give Mattel everything. They gave it in fact a small fraction of what Mattel... So the jury must have not thought that whatever the breach was meant that Mattel owned everything that MTA had produced. Why is that binding, in a sense, on the injunction of the district court? As Your Honor may recall, they raised the Seventh Amendment issue at the stay stage, but they have dropped the issue and have not raised it in their merits brief on appeal. And as we indicated in our opposition at the stay stage, the standard for finding an inconsistency as a violation of the Seventh Amendment is quite strict. It has to be that there's no conceivable way to read the verdict so that it would be consistent with the injunctive relief. And there were any number of ways, which we articulated in our opposition and cited portions of the evidence at the stay opposition, that indicated how you could read that and make it consistent. Indeed, they even suggested, you know, both two different theories. They suggested the theory that the jury could have found that some of the... that all of the dollars infringed, but not all in the same degree. The jury could have found a factor that they had emphasized, that there was a contribution to the improvement of the brand and marketing that accounted for some reduction in the damages while the product still infringed, and that the jury felt that that should be accounted in the numbers. That was an argument they had made to the jury. And it was a factor the district court considered very seriously at the equitable phase. I mean, putting aside that inconsistency argument, I'm still somewhat impressed by the fact that the jury that listened to everything didn't think that everything or even most of what M.G.A. produced should go to Macau. And then along comes the district judge and says everything. I mean, all the money you spend on advertising or promotion, additional effort. I mean, there was a lot built on blindside. The N.S. Truman giving you everything, you know, he took it out, he should have turned it over to Macau, giving you all those things. There's still a great deal that went into what is M.G.A.'s current business that is not of Macau's origin that was added. And why isn't there an abuse of discretion for the district judge to say all of that, all of that effort, all of that goes to Macau? I don't think it's an abuse of discretion. It's not something he took lightly. He said in his written order that it was a factor he had struggled with. I assume the district judge didn't take it lightly. You don't have to flack for the district judge here. I'm assuming that it was a serious decision. Nevertheless, people, judges make serious decisions and on all occasions, and sometimes abuse of discretion. So I want you to now assume that the district judge did his job as best he knew how and faithfully tried to apply the law and so on. Why isn't there an abuse of discretion when this is obviously, when you compare what Brian brought to M.G.A. and what they built it into, why isn't it abuse of discretion to give all of that and just hand it over to Macau? I don't think it's an abuse of discretion because I think the district court correctly concluded or acted within his discretion in concluding that there really was no other way to ensure that the fruits of the misconduct were brought to Macau. Isn't there royalty enough for a piece of the business or payment of additional damages? You know, why is it on those things? Why, I mean, it just seems quite drastic and somewhat unprecedented to simply say, because you took a nugget out. I mean, you know, I'm now giving you everything that's the opposing counsel's dispute and giving you all those points. Let's say you win on all of those points. You know, there was a contract, there was a breach of contract, or maybe it was trust, I'm giving you all those things. Still in all, when you're done, what Brian came out with that belonged to Mattel, because I'm giving you all this for purposes of this analysis, is really just a kernel, and much more went into it that seems to me now is destroyed or sort of handed over to somebody without any regards to the effort or time, the creative genius, and all those things that went into building up this enterprise. The district court gave two reasons for rejecting a royalty theory, and I think that those reasons are not an abuse of discretion. The first is that he said that the idea of the royalty was based on the idea that the ongoing infringement was minute. I missed the word minute. That was the word that he used. And he rejected that premise. He said, I'm not bound by the Seventh Amendment implications of the verdict to accept it, and he did not accept it. And then the second factor is that he said that the hostility between the parties that he had witnessed in the case made that remedy unworkable. I don't think it's an abuse of discretion in light of those factors. Yes. It's workable to order a royalty. You just order it and then anybody breaches it. It's a contempt. I mean, sort of don't cash checks that they come from from somebody they don't like. It's a serious matter. When at one point he he placed MGA temporarily in receivership and then later converted it to a monitor because he found that MGA. There was reason to believe that they were engaging in efforts to obstruct his orders. So he found that they would somehow cheat on the royalty. No, that's not what he said. He just said that the hostility between the parties and the lack of trust. And I think that that's based in part on certainly from our perspective, the fraudulent behavior that's amply demonstrated in this record. They're back over and over and over again complaining that they were playing games with the royalty figures. He did not elaborate. Perhaps that that's the basis of the concern. I just I think it's very hard. I don't find that very persuasive. So why should try to persuade me why that's a good reason. Well, it says you're going to pay 15 percent or 20 percent. I'm just coming up with a figure of your gross receipts or whatever. The picks a formula and says you are ordered and joined to provide this. And that doesn't work because the parties don't like each other. I don't get it. I find that they never have to meet again. All they have to do is once in a while they get a bank transfer, a check, or the lawyers meet and hand each other a bundle of cash. You'd be willing to do that if I take the money. He certainly had the equitable discretion having sat. I understand that. You understand my question. You are trying to justify. You're saying it's not an abuse of discretion because of these two reasons. We're now analyzing the second of these two reasons. I'm telling you, I don't get it. I don't find it persuasive. Now, can you say anything else to make it persuasive? I mean, the fact that they don't like each other. I mean, do you know a lot of litigants? A lot of your clients that litigate against other clients love the other side. I mean, really? I do think that what he was suggesting is the fact that it would be, in his view, logistically unworkable, would require a degree of ongoing supervision. Exactly what did he say? All that he said. He said, I'm making a finding based on demonstrable conduct in addition to the jury's verdict in this case that they can't be trusted to send loyalty checks, and all I think we're going to do is to be back here over and over and over again fighting about whether they're coming up. He didn't say anything like that, or did he? No, he didn't. He said one sentence. Okay, if he doesn't tell us then to pay over loyalty checks, why isn't he then commanding Mattel to pay over loyalty checks to them to make up for their contributions? Why is that a fairer, more equitable solution? Say, okay, you get Bratz, and let's say we're going to get an alternative, and you guys send the checks over for what they contributed to it. Or why could there have been an apportionment? I mean, he talks about this, about apportioning between the first generation Bratz dolls, which were more clearly owned by Mattel, and later generations where it was obvious that MGA had put a lot of work and money and investment into creating those. So I think there would be an apportionment along those lines. Even the jury obviously thought there was some way to apportion that. I think for two reasons. First, he did not accept a demarcation at the end of the first. Why? Because he examined all of the dolls. He indicated he had them in a particular courtroom set aside in Riverside and found that they were all substantially similar. They all infringed. Some people, all dolls look alike. Oh, guys. He went through the appropriate filtering analysis and concluded that all of them were substantially similar. He went through them all individually and made that conclusion. But the other thing, which I think we can't lose sight of, this is something where the misconduct is there from day one. They knew from day one that these were someone else's property. They knew from day one as they developed it forward and they concealed it at every step. It is certainly within his discretion to say that, you know, when you take an idea and you've stolen it from day one, that everything you add to it goes with it. That's essentially what he concluded on the equities of this case. And that, I think, is not an illusion. Was it helpful that his judgment and exercise of discretion was at all affected by the very litigious nature and rancorous nature of this litigation? I think that the judge did his level best to treat the parties as fairly as he could. He seemed to take some of the comments about himself quite personally and wrote full orders about, I don't know who made what comments, I can't even remember right now, but in reading through all the orders, there seems to be a lot of kind of hostility and some of which found its way to us in these briefs. And I'm wondering if that didn't have an impact in coloring his discretion, because it is kind of a draconian remedy. I think to the extent that the remedy is severe, it's because the misconduct was severe, and as I indicated, from day one. This was not something that came in later in the process after they had substantially invested. They made the decision from the beginning to invest in something they knew was stolen. And he concluded that that meant that the entire thing... It harkens back to Hammurabi, an eye for an eye, a tooth for a tooth. It's within his... I think on these facts, it's not an abuse of discretion to make that conclusion. I see that I'm... You said you had a second reason. There were two reasons. One of them had to do with the difficulty of enforcement. The other one was... The other one was essentially the one that I just said about the circumstances of the case. Exactly. I see that I'm running out of my time. There's quite a number of issues. You said there was another reason having to do with any royalty would be minute? Oh, no. What I was saying is he gave two reasons why he rejected a royalty. He viewed the royalty theory as being... The preference for a royalty remedy as being based on the assumption that the infringement was only minute. In other words, that all the dolls infringed, but only in small degrees. Again, this was based on the same... As it was presented to him, it was based on the same argument that the jury and verdict for $10 million should be read in that way. Is there any public interest involved here at all? There is a public interest involved, and he considered the public interest factually as a paragraph on that on page 1019 of the excerpt where he considered that. And here the public interest in preventing the kind of misconduct that occurred here he found to be prevailing. What about the public interest in maintaining what is highly popular and sought after line of products, which I guess Mattel does not promise to maintain at all? No. In the district court, we've indicated our plans to produce a line of dolls that would be released next year. A line of Bratz dolls? A line of Bratz dolls, yes. And indeed, in the stay litigation, it was quite a bit of back and forth over which side was really going to be more faithful to maintaining the health of the Bratz brand. So I think within the public interest, his remedy is unassailable in that respect. Kind of weighed, he said in these troubled economic times, there's a strong public interest in maintaining a profitable enterprise as a going concern. And then he weighed that against the interest in enforcing copyright laws in a uniform manner. And then he weighed that against the interest in enforcing copyright laws in a uniform manner. But didn't the other remedy, the damages for the copyright infringement, take care of that one? No. I don't think that the respect for the law and enforcement of the rules and undoing and punishing and not allowing to be rewarded misconduct and tortious conduct was fully remedied simply by damages. He didn't say that. Well, he did find that it was an irreparable injury that monetary remedies were inadequate. And in analyzing the public interest, he looked at the importance of enforcing the law and ensuring that property rights were. You know, I'm reading the brief paragraph where the judge divorced the public interest. I don't see anything about little girls and dolls. It talks about employment. It talks about strong public interest in copyrights and all that. But what about all those children out there who used the dolls and liked the dolls and would suffer disruption if the dolls were discontinued? But they've not contended on appeal that he abused his discretion because the BAM was going to be killed. And there's no evidence to say. I'm asking you about what the district judge said in his order. I said, what about the public interest? And he said, oh, he took it into account. And you pointed me to a page, and I found the page, and I'm reading it, and there's nothing about it there. You said they made some – your client made some representation in the district court. I don't see it embodied in here. And I'm not sure how – I'm asking whether or not in coming up with this remedy, the district judge should not have considered the effect on the consuming public. He didn't recite that specifically, the – Well, he didn't, but I think – Did he do it generally? Did he do it in French? The issue about whether or not the BAM was going to be killed and who would harm it more really was litigated more after the order in the context of the stay. It was actually a significant part of the stay papers in this court. The stay contended we would kill the BAM. BAM recontended they were killing the BAM so that it would be dead before we got it. And there were factual disputes over who was going to – I remember that. I remember that. But if, you know, we were to affirm this and the litigation were over, is there anything that prevents Mattel from killing the BAM six months from now? I think that given the representations that we've made to the court, if we had a successful brand that, you know, that would be something I don't expect we would do. So we have – That wasn't a yes or a no. Yeah, but I was thinking something else. Well, there are rights. And so at the end of the day, if it's economically not viable and we have the rights – Did you hear my question? Yes. I wasn't asking you does Mattel have a good reason for doing it. Did you hear my question? Is there anything here in this litigation that prevents Mattel from killing the brand in six months for whatever reason? Because good reasons or bad reasons or economic reasons or, you know, whatever reason. Is there anything in this litigation that if it's concluded favorably to Mattel, if it's concluded as this portion of it is favorable to Mattel, that would keep it from saying six months from now, you know what, we don't, you know, we're going to kill this. Anything that prevents that? There's nothing within the four corners of the order that does. I think if we were to, you know, proceed in a way that the district court or certainly the other side proceed to be bad faith in terms of how we have represented what we would do, they would be in there with a 60B or some kind of a motion for relief. But within the four corners, no, it assigns the rights. The rights are ours. What's still going on in the district court? There were several things going on, and actually some of what's happened in the last even hundred hours could affect both the cross-appeal and the curtail motion. The district court accelerated its in-camera review of the documents that are at issue in the Phase 2 motion and reviewed them in camera on Friday, ordered briefing, which was essentially completed within a four-day period between the 4th and the 8th. The reply was filed yesterday. If he proceeds and actually decides the Phase 2 motion, that would move the curtail motion. If in deciding that motion he grants it and gives us the documents, it would move the cross-appeal entirely. But we do not have any order from the district court at this point. Did Judge Carter inherit this? That's correct, Your Honor. So Judge Carter has conducted those proceedings. Is that all that's left of this litigation? I know we've had 1A, 1B, 1C. Do we have a 2? There's a Phase 2, which has the remaining claims. That's correct. And what are the remaining claims? Primarily RICO claims is a significant, the principal part of that. And who's suing who in RICO? Our RICO claims. If we let this constructive trust go, who are you going to be suing? Excuse me? If we affirm on the constructive trust, who are you going to be suing and for what? We have a further complaint with respect to other acts of misconduct against MGA that are the subject of the RICO claim and related claims that were severed off from the Bratz-related claim. Nothing to do with Bratz? I can't say that there's nothing to do with it because it does involve other thefts, alleged thefts, acts of intellectual property, and some of the acts of predicate acts are related to things from Phase 1. Okay. Thank you. No further questions? We'll hear back from Mr. Rosenkranz. You have an eternity left. Eight minutes and ten seconds. Your Honors, let me just go through the issues in order. First on the contract claim, Mattel's argument is that we waived. I just want to point the Court to the record in two spots where there absolutely was no waiver. We preserved twice on the ideas question. The first is quoted in our brief in reply pages 11 through 13. In Bryant's opposition to the summary judgment motion on contract interpretation, that was preserved. We joined that, but more importantly, in the course of arguing the motion, I would point the Court to pages 124 to 130 of our supplemental excerpts of record, a long six-page colloquy that was essentially the same conversation that we've been having about why is the word ideas not in the contract. I'm quoting here, what is missing is the term, the word idea. The point is, if Mattel wants the idea, why don't we simply put it in there and alert the Mattel employee sitting in the room. If Mattel wanted to protect Carter Bryant's ideas, they could have clearly said so. Well, it seems Judge Larson was more convinced by the design itself that had the name on it. Am I wrong about that? No, Your Honor. Judge Carter, excuse me, Judge Larson never said that. Judge Larson insinuated the word idea into his summary judgment ruling and never said a thing about the notion that ideas are part of trade names. But let me turn to that. This contract could not possibly cover the idea for a trade name. So this is the inventions agreement. The inventions agreement covers copyrights and applications for copyrights. It covers patents and applications for patents. It doesn't even cover a trade name. So the notion that it covers, or by the way, an application for a trade name, the notion that it covers the idea for a trade name is really a stretch, which brings me to the interplay on the two sides as to the contract interpretation issues. Now, the very fact that we're finally parsing the words of an inventions agreement that's barely legible and asking, well, what does 2870 cover, just demonstrates that someone in Carter Bryant's position couldn't possibly have believed that this was an unambiguous conveyance of his ideas or that it unambiguously covers everything that he does, even within the line of business for when it comes to creative works, much less that he believes that the contract communicates that clearly. As to the torts, just one point to make. There was a lot of discussion on tortious interference with contract. Now, the jury did not find that MGA tortiously interfered with this contract by inducing Carter Bryant to convey IP. The district court directed the jury that it could find tortious interference with contract from one act and one act only, and that was that Carter Bryant disrupted his at-will employment by signing this agreement while he was still employed by Mattel. That is, while he was still employed. Now, an assignment of IP would be without regard to whether he was still employed or not. And secondly, Mattel disclaimed any intention to pursue a trade secret theory. It did it explicitly on the record and specifically with respect to the idea for the name Bratz. Trade secret or trademark? Trade secret, Your Honor. My point is if Mattel was after the intellectual property in the idea for the name Bratz, the only way that becomes protected property is if the disclosure of that idea is a violation of the contract. Let me say that more clearly, sorry. The telephone claim is that this tortious interference with contract depends upon the tortious disclosure to MGA of the idea for the name Bratz. Well, if the contract does not prohibit the disclosure of the idea for the name Bratz, it couldn't be tortious for MGA to encourage Carter Bryant to disclose that. I mean, the reality, though, is that Carter Bryant did exactly what Mattel was trying to prevent him from doing when it hadn't signed the contract. But this isn't this is not the computer programmer who was working at home. He didn't cure cancer on his own time. I mean, it wasn't even on his own time. I mean, we've got lots of evidence of phone calls and faxes from work. We have co-workers being enlisted to help. Parts of dolls they used. So, Your Honor, all of that was hotly disputed, both of those facts and the inferences to be drawn from them. The district court gave the jury a shortcut to finding both disloyalty and breach of fiduciary duty by directing the jury that it is disloyal as a matter of law simply to sign a contract to go into business with a competitor while you're still an employee. Now, that's dead wrong as a matter of California law. It is not a breach of the duty of loyalty to be at a job while you're negotiating a deal. You don't under California have to vacate your. So let's give you that. What flows from that? Well, what flows from that was that was the basis on which the jury delivered its verdict. The verdict has to be eliminated. If there still remains a question of fact as to whether this is a breach of the duty of loyalty, there would have to be a retrial on that. That is, you know, the whole argument that Metellus made. Now, Metellus presented in his brief. What was the jury's finding specifically? The jury was asked to find whether there was a breach of the duty of loyalty, and the jury was directed that there is a breach of the duty of loyalty when a employee, when Carter Bryant, signed the inventions agreement while still employed. So the jury's finding was what the judge told them to find. I mean, that was not just a shortcut. It was a direction to find a breach of the duty of loyalty. And, of course, if the duty of loyalty is breached, then the fiduciary duty has to be breached. This is an argument that you will be able to raise in an appeal from the jury verdict. But we now have a judge who sat there and watched the entire trial, and he enters injunctive relief. He thought that evidence didn't support the finding that, in fact, your client did this on work time. Which part of those facts, by the way, are you disputing? Is it a dispute that your client used the mock-up doll using Ken's boots and stuff he got out of the trash? I forget about it. There was a whole list of things that he got from Metellus. So is there any dispute as to that? There are disputes as to most of the facts that Metellus recites on pages 9 to 12 of their brief about the extent of the breach. Some of the facts are not disputed, but there are huge disputes about the inferences. For example, which of the facts are not disputed? So let me give you MGA's version. I mean, Metellus presented essentially the summation in his brief. MGA's version of the summation goes something like this. MGA never saw this contract and got assurances from Carter Bryant that he owned the IT. In fact, that he created it before this contract, excuse me, before he was even at Metellus. Virtually everything blameworthy that Metellus tries to pin on Carter Bryant was in his last couple of weeks on the job after he'd already been given notice. And after MGA had directed him to leave, so MGA was not even aware that he was still working at Metellus, Carter Bryant drew all of these drawings on his own time in his own space. There is no dispute about that. After handing over the drawings, he had virtually no interaction with the design team while he was still at Metellus. It was just two meetings, and he basically gave them direction. Here's the idea. Here's an ad I want you to mimic for the general style. Have at it. The designs were nowhere near done when he left MGA. The only company resources he used, apropos of the direct question that was asked, was not in connection with the designs. It was in connection with a Frankenstein of a doll that he used in the pitch that MGA found so horrible that it actually directed him to throw it out, and the resources were pulling ahead of a Barbie out of a trash can, and then going to a couple of his colleagues to ask them for favors, one of whom he paid, the other of whom did a favor for him that took 20 minutes. Something was still working for Metellus? Yes, Your Honor. See, that's what I was getting at. You sort of drowned everything that I was interested in in other stuff, but thanks.  I hear you. Okay. The question was- They always answer the question they wish they'd been asked. Was all that activity, was that after he contracted with MGA or before he contracted with MGA? After. A lot of the activity was after the signing of the contract. The prototype doll was part of the pitch, but it had nothing to do with the IP that MGA got. MGA got the designs, not this Frankenstein doll. They didn't care about that doll. Their dolls looked nothing like the doll that Carter Bryant brought to show the proportions. That was all he was doing. So, just turning to the copyright point, Chief Judge Kavinsky is right. The district court didn't go far beyond the scope of what the jury had found. Bear in mind that Mattel was seeking disgorgement of profits, $1.4 billion worth of profits for these female glass dolls. The jury awarded $10 million, 1%. That was a victory for MGA. It did so after asking- $10 million? Excuse me, Your Honor. $10? $10 million, yes. $10 million, 1% of what Mattel had described as- $100 million? For the copyright piece, Your Honor. I'm just talking about copyright. Whatever it is. The copyright right was $10 million, Your Honor. So, if we're talking about this- I'm sorry. I'd rather ask the question. The copyright part was 10%. It was 1%, Your Honor. It was $10 million. $10 million, 1%, yes, Your Honor. The jury made that award after asking the judge, is it okay if we find infringement only as to the first generation? And that was with a jury that was instructed under wrong standards, substantial similarity. There was no question under a virtual identity standard the jury would not have reached that verdict, or even properly instructed to pull out some of the elements, the jury would not have reached that verdict. Finally, let me just close with this. This has been the quintessential American nightmare. And I don't just mean for Isaac Larry, who came to this country to build a business, live the American dream, and now to have it all taken away. It's a nightmare for the American employee who believes that there's a possibility that he can go out and take his ideas somewhere else, that his employer doesn't own those ideas, who's now being told that there's always an employer looking over his shoulder who can claim that he owned that idea or owned the concepts. It's a nightmare for free expression because Mattel has been trying for decades to own the image of the human body and keeps getting turned down by the courts until now. It's a nightmare for competition if a worldwide business can be sunk on the basis of an employment contract that the company never even saw. The remedy, as the court was talking to Mr. Collins about that, is an absolute nightmare. It is absolutely no promise that Mattel is going to keep the Bratz name alive. Mattel's agenda was, and I quote, to kill Bratz. Every time it's been asked the answer to the question, are you going to maintain Bratz, it has always left wiggle room to say, well, only if the Bratz brand is not already decimated. And the Bratz brand is decimated. There will be no Bratz on the shelves coming up in the next season. The Bratz will all be taken off the shelves. And Mattel has never said anything other than that it will be prepared to send Bratz to licensors between then and April. And so, finally, let me just end with a plea. The equitable relief that has been granted has absolutely decimated MGA. It is hobbling right now. The recall is currently underway, and every single day that goes by continues the march over the cliff. So if this court has any doubt about the validity of the relief that's been granted, I just beg the court to act as quickly as possible with an order at least staying the injunctive relief. And so MGA can survive while the court is ultimately issuing its opinion. But the bottom line is I just ask this court to end this nightmare that is not just a nightmare for MGA, but I think for American law. Thank you, Your Honors. Thank you. Well, the case is arguably submitted. I thank counsel for a very thorough argument. We are adjourned.
judges: Kozinski, Trott, Wardlaw